## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **MULTIMEDIA CONTENT MANAGEMENT LLC,** §§§§ | | |
| **Plaintiff,** § | **Civil Case No. 6-17-cv-00307** | |
| § | | |
| **v.** § | | |
| § | **JURY TRIAL DEMANDED** | |
| **GRANDE COMMUNICATIONS NETWORKS LLC,** §§ | | |
| **Defendant.** | | |

### FIRST AMENDED COMPLAINT[1]

Plaintiff Multimedia Content Management LLC ("MCM" or "Plaintiff"), by its undersigned attorneys, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

### THE NATURE OF THIS ACTION

1.     MCM brings this action pursuant to 35 U.S.C. §§ 1 *et seq.* to compel Defendant Grande Communications Networks LLC ("Grande" or "Defendant") to cease infringing and to compensate MCM for Grande's infringement of United States Patent Nos. 8,799,468 ("the '468 Patent") (Exhibit A) and 9,465,925 ("the '925 Patent") (Exhibit B) (collectively, "the Patents-in-suit").

Grande's Network Cable Television Infrastructure and Equipment

---

[1] Grande filed its Answer and Counterclaims on January 22, 2018.  Twenty-one days later, this Court stayed all deadlines and settings.  (D.I. 19).  On February 28, 2018 this Court extended the stay of all deadlines and setting to and including March 12, 2018.  (D.I. 21).  As MCM's First Amended Complaint has been filed and served within 21 days after service of Grande's Answer and Counterclaims, amendment is filed as a matter of course under Fed.R.Civ.P. 15(a).

2.      Cable television began as communities in mountainous or other remote locations attempted to receive over-the-air broadcasts.  Those communities used "community antennas" in the 1940s and 1950s that were then connected to subscribers' homes by cable to provide access to the broadcast signal.  *See* https://www.calcable.org/learn/history-of-cable/ (Copyright 2017, California Cable & Telecommunications Association) (last accessed June 27, 2017).

3.      Since then, the cable television industry has undergone significant technological advancement such that the "technological landscape is unrecognizable compared with even a few years ago . . . thanks to broadband cable and other breakthroughs." *Id*.  One key change in cable television was the transition from "one-way" cable television, i.e., the broadcast is simply provided to users of the cable television system, to "two-way" cable television, i.e., the user of a cable television can demand from the cable network greater functionality above and beyond the simple provision of broadcast services.

4.      Grande offers two-way cable television services.

5.      The change from one-way to two-way systems gave Grande the opportunity to provide more and varied services to its customers.  It also, however, provided a greater opportunity for bad actors to access these services while attempting to circumvent copyright and other protections for the content.  The rise of peer-to-peer ("P2P") computing and the increasing ease of networking technologies beginning in the early 2000s allowed users to share large files efficiently over

FIRST AMENDED COMPLAINT                                             Page 2

distributed networks, particularly copyrighted material like movies, which increased the opportunities for bad actors.

6.     To protect against P2P file-sharing services, such as BitTorrent, the cable television industry began working in the early 21st century on standards and other technologies to combat piracy.  Since that time, the industry has struggled to find flexible solutions to combat threats from unauthorized users.

7.     Grande governs its cable television service through a Terms of Service contract, Basic Conditions of Service Regarding Cable TV & Internet Service. (*See* Exhibit I, Basic Conditions of Service Regarding Cable TV & Internet Service (hereinafter "TOS").)

8.     Under its TOS contract, Grande defines Grande's "equipment" as "one or more of the following:  digital receiver, broadband modem, telephony port, remote-control unit, A/B switch, or any other device installed by Grande in or around the Premises, or provided by Grande, necessary or convenient for Customer to receive and utilize Services from Grande." *Id.* at 1.  "All equipment of any kind provided by Grande remains the sole property of Grande"; Grande leases this equipment to its subscribers. *Id.*  Under these contractual terms, Grande requires that its subscribers agree "not to attempt to make repairs to, or to alter, disturb or tamper with the Equipment and that you will not permit anyone other than Grande or Grande's agent to perform any work on the Equipment." *Id.* at 1.  Additionally, Grande requires its subscribers to authorize "Grande to charge your Visa, MasterCard, other credit card,

or other payment method that has been authorized by you for any such outstanding Service and Equipment charges." *Id.* at 2.

9.      Grande has at least one headend for each of its service areas.  These headends allow for the distribution of content from any of several sources, including over the air and satellite, to its subscribers over Grande's cable network.  Each headend may include equipment such as digital receivers, digital network control systems, broad-band integrated gateways, head-end Quadrature Phase Shift Keyed Modulator ("QSPK") and Quadrature Amplitude Modulator ("QAM") modulators, and Digital Audio-Visual Council ("DAVIC") controllers.

The Grande Network Cable Television Service

10.     Grande operates a network to provide, among other services, internet, phone, cable TV, and video-on-demand ("VOD") services to its customers.

11.     Grande maintains a data center that includes a collection of computing resources, such as servers and memory storage devices, to manage, store, and deliver content, including video-on-demand movies and other content to customers.

12.     With respect to cable TV, the Grande network includes interactive set-top boxes such as the Motorola DCT6200/DCT6208 High Definition Cable Receiver, and the Scientific Atlanta Explorer 2000, 3250, 8000, and 8300 Cable Receivers, for lease to its customers.

13.     Set-Top Boxes are located in customer's homes and allow customers to view television programs, record shows and movies, and purchase pay-per-view

movies and other programming content (such as special events and other on-demand shows).

14.     While STBs are located within the homes of Grande's customers, Grande maintains ownership and control of the STBs.

15.     Movies and other programming (special events, on-demand shows, and other on-demand programming content) purchased on demand are generally referred to as impulse pay per view ("IPPV") (hereinafter "IPPV content").  With the Grande service, customers can order IPPV content using a remote control in conjunction with a STB.

16.     Ordering IPPV content is accomplished through the use of an interactive program guide ("IPG") (e.g. displayed on a TV) where the user selects desired IPPV content and presses the "B" button to "buy" the IPPV content and then presses the "A" button to confirm the purchase.

17.     Grande provides its customers with up to $150 in credit to be able to purchase movies before reconciling purchases.

18.     Once a Grande customer purchases a movie, the customer typically has 48 hours to watch the movie.

19.     The Grande customer can watch the purchased movie as many times as practical within the 48-hour rental window.   During this window, the Grande customer can, for example, rewind, pause, fast forward, and restart the movie.

20.     The Grande headend data center transmits control instructions to the STBs.  These control instructions can include updated firmware or software for the

FIRST AMENDED COMPLAINT                                          Page 5

STB, updated instructions for implementing or updating the IPG, Copy Control Information ("CCI"), Entitlement Control Messages ("ECM"), or Entitlement Management Messages ("EMM").

21.     The ECMs and EMMs include control instructions for, among other things, access control to video-on-demand programming, and includes decryption keys and valid times for showing VOD movies.

22.     Grande's headend transmits VOD movies or encrypted content.

Grande's Conditional Access Module ("CAM")

23.     When a user first requests to view IPPV content, a request to a conditional access module (CAM) within the STB is issued by a processor in the STB.

24.     The CAM includes an access control processor and related circuitry and software.

25.     The CAM receives and processes ECMs and EMMs, including decryption keys for IPPV content, and determines whether particular IPPV content has been rented and the expiration of any rental of such IPPV content.

26.     Once the user confirms an IPPV content purchase, the CAM updates entitlement information according to the ECM and EMM instructions received from the Grande headend data center.  The STB is then able to transmit the customer's request for the IPPV content to the network.  If the CAM does not authorize the IPPV content purchase, the user's request for the IPPV content is not transmitted to the network.  In response to receiving the IPPV content request, the Grande headend data center transmits the IPPV content to the STB via an encrypted stream.  Using

a decryption key received from the CAM, the STB then decrypts the IPPV content and sends the encrypted content to an output device for display.

27.     Once IPPV content is rented, the customer has the option of rewinding, pausing, or fast-forwarding the IPPV content.  The customer can also restart the IPPV content.  If the customer initiates these requests within the rental period, the CAM and associated circuitry and software allow the STB to issue the appropriate content requests to the network (e.g., request the IPPV content starting at the beginning, request IPPV content starting at an earlier point in the stream, request IPPV content starting at a later point in the stream).  If, however, the rental period has elapsed, the CAM and associated circuitry and software will not transmit the customer's request for the IPPV content via the Grande network to the Grande headend data center.

## **THE PARTIES**

28.     Plaintiff MCM is a company formed under the laws of the State of Delaware.

29.     Defendant Grande is a company formed under the laws of the State of Delaware with its headquarters at 401 Carlson Circle, San Marcos, Texas 78666. Grande offers its infringing cable television service in and around Austin, Midland, Odessa, San Antonio, San Marcos, Temple, and Waco—all within the Western District of Texas.

FIRST AMENDED COMPLAINT                                                    Page 7

## JURISDICTION AND VENUE

30.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper in this District and Division under 28 U.S.C. § 1400(b).

31.     The Court has personal jurisdiction over Grande.  Grande has systematic and continuous business contacts with the State of Texas, this District and this Division, including, *inter alia*, the presence of various sales and service centers in Temple and Waco within this Division, real and personal property in Bell and McLennan Counties, employees based in Waco, and through its provision of cable television and internet services to thousands of subscribers who reside throughout the State of Texas, this District, and this Division.

32.     Grande has infringed and continues to infringe one or more claims of the '468 Patent and the '925 Patent in this District and Division through Grande's provision of services as described herein.

33.     Grande has regular and established places of business in this District and Division, including Bell and McLennan Counties, including an office located in Temple at 8 East Barton Avenue, Temple, Texas 76501, and an office in Waco located at 7200 Imperial Drive, Waco, Texas 76712.

34.     Venue is therefore proper in this District and Division.  28 U.S.C. § 1400(b).

FIRST AMENDED COMPLAINT                                                      Page 8

## THE PATENTS-IN-SUIT

35.    The United States Patent and Trademark Office ("USPTO") duly and
legally issued United States Patent No. 8,799,468 entitled "System for Regulating
Access to and Distributing Content in a Network" to Robert M. Burke II and David
Z. Carman on August 5, 2014.  The '468 Patent is a continuation of United States
Patent Application No. 10/989,023, now United States Patent No. 8,122,128, and
claims priority to United States Provisional Application No. 60/523,057 filed on
November 18, 2003.  A true and correct copy of the '468 Patent is attached hereto as
Exhibit A.

36.    The USPTO and technology leaders including Time Warner Cable and
Sony Computer Entertainment have cited the '468 Patent.  *See*
https://patents.google.com/patent/US8799468B2/-en?oq=8%2c799%2c468+#citedBy
(last accessed March 3, 2018).

37.    On August 11, 2017 Unified Patents Inc. filed a 105-page Petition
(with 14 exhibits) before the United States Patent Trial and Appeal Board pursuant
to 35 U.S.C. §§ 311–319 seeking to institute an inter partes review of Claims 1–5, 9,
11–13, 19, 23–27, and 32–34 of the '468 Patent.  Unified Patents argued that the
claims were obvious and therefore invalid under 35 USC §103.  Applying the
standard set forth in 35 U.S.C. § 314(a), which requires that Petitioner demonstrate
a reasonable likelihood that it would prevail with respect to at least one challenged
claim, the Board denied the Petition.  See Exhibit J attached (Decision Denying
Institution of *Inter Partes* Review in IPR2017-01934, March 5, 2018).  "We also

conclude Petitioner has not demonstrated a reasonable likelihood of prevailing . . . ." *Id.* at 15.

38.     The USPTO duly and legally issued United States Patent No. 9,465,925 entitled "System for Regulating Access to and Distributing Content in a Network" to Robert M. Burke II and David Z. Carman on October 11, 2016.  The '925 Patent is a continuation of the application for the '468 Patent and claims priority to United States Provisional Application No. 60/523,057 filed on November 18, 2003.  A true and correct copy of the '925 Patent is attached hereto as Exhibit B.

39.     The USPTO and technology leaders including Time Warner Cable and Sony Computer Entertainment have cited the '925 Patent.  *See* https://patents.google.com/patent/US9465925#citedBy (last accessed March 3, 2018).

40.     MCM is the assignee of all right, title, and interest to the '468 Patent and the '925 Patent.  Accordingly, MCM has standing to bring the instant suit to enforce its rights under the patent laws of the United States, including the right to collect damages for past infringement.

41.     Neither MCM nor any previous assignee has licensed the Patents-in-suit to Grande.

42.     MCM has not practiced the claimed inventions of the Patents-in-suit.

43.     The Patents-in-suit describe and claim systems and methods for regulating access to a service provider network.

FIRST AMENDED COMPLAINT                                          Page 10

44.     The claims of the Patents-in-suit recite novel and nonobvious systems and methods to rapidly and efficiently deliver content, such as music, video, games, broadband data, real-time audio or voice applications, and software, to subscribers while respecting the rights of the owners of the intellectual property that protect such content.  Exhibit A, the '468 Patent, at col. 1, ll. 24-51.[2]

45.     The specifications of the Patents-in-suit recount the reluctance of the owners of proprietary content, including the motion picture industry, to provide their content over the internet "having seen the negative impact that piracy has already had on the Music Recording Industry."  *Id.*, at col. 2, ll. 60-62.  To avoid a similar fate, service providers—like cable TV providers and content providers—like the motion picture industry—needed some assurance that their "intellectual property (music, video, games, software, etc.) will be secure from illegal downloading and transmission over the [otherwise insecure] Internet."  *Id.*, col. 1, ll. 60-63.

46.     Regulating access to proprietary content to customers connected via a network in the manner claimed in the '468 and '925 Patents solved technical problems previously existing in the field of digital content distribution.  For example, the '925 Patent describes systems and methods for providing "a gateway unit associated with a user [that] receives controller instructions from the network" such that when "a gateway unit receives a network access request from a user" the

---

[2] The specifications of the '468 Patent and the '925 Patent are largely identical.  Citation to the specification of one patent, therefore, serves as citation to the specification of the other Patent.

FIRST AMENDED COMPLAINT                                        Page 11

"gateway unit selectively transmits the network access request[] over the network"
only in "accordance with . . . controller instructions." *Id*. at col. 8, ll. 12–21.  Thus,
the customer can receive only authorized content, which means that content
providers will make more content available through networks that include the
claimed access regulating system or practice the claimed access methods.

47.    Prior to the inventions of the '925 and 468 Patents service "providers
and content providers need[ed] the assurance that the[ir] intellectual property
(music, video, games, software, etc.)" would be "secure from illegal downloading and
transmission over the Internet," which had become "a major source of lost revenues
and the basis for hundreds of lawsuits." *Id*. at col. 1, ll. 60–64.

48.    The '925 and '468 Patents claim "[t]echniques that reduce the strain on
a content provider's resources" and "improve the speed and efficiency of accessing
content in a network." *Id*. at col. 2, ll.  6-10.

49.    The new computer techniques claimed in the '925 and '468 Patents also
"reduce the . . . volume[] of network data traffic" by efficiently managing the
distribution of proprietary content.  *Id*. at col. 2, ll.  8-11.  Content can be
downloaded to a subscriber's set-top box, yet remain under the control of the access
regulation system.  For example, a movie needs to be downloaded only once, and
therefore does not need to be downloaded again every time the subscriber resumes
watching after taking a break.  That feature reduces network and internet traffic
and speeds up the flow of traffic on the internet or proprietary network.

50.     The specifications of the Patents-in-suit explain, for example that the claimed systems and methods may deny "subscribers the capability to send or to receive data from or to 'pirate' URLs or IP addresses that are known to contain unlicensed copyrighted material." *Id*. at col. 8, ll. 24-32.  The claimed techniques enable the network to direct that the requested content be accessed only from authorized sources.

51.     The limitations in the claims of the '925 and '468 Patents prevent preemption of all systems or processes for regulating access to a service provider network.  The claimed systems and methods include "communication gateways, installed at a subscriber site, internet control points, installed remotely, and various network elements installed throughout the network." (Abstracts of the Patents-in-suit).  "The communication gateways and network elements operate in conjunction with the internet control points to restrict or allow access to specified Internet sites and to manage efficient distribution of content." *Id*.  The methods use "a controller node coupled to the network" and the "controller node [includes] a . . . processor for generating controller instructions." '925 Patent at col. 2, ll. 33-37.  The controller node also includes a "network interface for transmitting the controller instructions over the network." *Id*. at ll. 37-39.  The systems and methods can also use one or more gateway units, which are components that include "a user interface [that can] receiv[e] user-entered network access requests." *Id*. at ll. 38-40.  There can also be "a second network interface coupled to the network [to] receiv[e] controller instructions from the network and a second processor, [where] the second processor

FIRST AMENDED COMPLAINT                                         Page 13

selectively transmit[s] at least some of the network access requests over the network in accordance with the controller instructions." *Id*. at ll. 41-45. The claims also recite systems and methods specifying components for "distributing content over a network." *Id*. at ll. 61-65.

52. The limitations in the claims of the '925 and '468 Patents also prevent preemption of all systems or processes for distributing content over a network. The systems and methods include "a controller node [that is] coupled to the network" where the "controller node [includes at least one] processor [that] generates controller instructions." '925 Patent, col. 2, l. 65—col. 3., l. 2. The claims also a cite a "network interface" which is a component that "transmits the controller instructions over the network." '925 Patent, col. 3, ll. 1-2. The system and method claims also recite one or more "network units" that can include "a second network interface coupled to the network," where "the second network interface in at least . . . one of the network units receiv[es] controller instructions from the network." *Id*. at ll. 3-6. That second network interface component can also "receiv[e] a portion of a content data file from at least a second one of the network units and a second processor." *Id*. at ll. 6-8. The "second processor in the at least first one of the network units" is a component that can "selectively forward [ a] portion of the content data file received from . . . one of the network units to at least a third . . . network unit," all "in accordance with the controller instructions." *Id*. at ll. 9-13.

FIRST AMENDED COMPLAINT                                                    Page 14

53.    Figure 1 of the '925 Patent illustrates an architecture for the claimed systems and methods that is a "collection of hardware components and software routines executed by the components." '925 Patent, col. 3, ll. 46-49.



Figure 1

From the top of Figure 1, 62 is an internet service provider, which works in conjunction with the claimed communication gateways 58.  Components 56 and 57 have proprietary digital content that must be delivered by using, in part, an otherwise insecure network such as the internet (item 52 in Figure 1).  Subscriber terminals, $60_1$ through $60_n$, can include various devices including television monitors and computers operated by subscribers to a network such as Grande's.  Communication

gateways "operate in conjunction" with the internet service provider "under the control of 'controller nodes,'" which in Figure 1 is labeled as "internet control point" 50. '925 Patent col. 3, ll. 55-58. "The software routines located in" the communications gateways and the controller nodes "provide a suite of features for the system." *Id*. at ll. 60-65. The controller nodes "control subscriber access to web sites and . . . deliver data to subscribers." *Id*. at 66-67.

54.     At the end of the eight-year examination of the applications that lead to the '468 Patent,[3] the USPTO Examiner wrote that the combination of components recited in the claims was unique, novel, and nonobvious over all known references and techniques. Exhibit K (Notice of Allowance, June 30, 2014) ("The features identified, in combination with other claim limitations, are neither suggested nor discussed by the prior art of record.").

55.     The claims of the '925 and the '468 Patents are not directed to a method of organizing human activity, nor are they directed to a fundamental economic practice long prevalent in our system of commerce. The claims of the Patents-in-suit recite systems and methods that solve recent technical problems— how to regulate access to a service provider network—by providing novel technical solutions for "the delivery of electronic data or content such as music, video, games, broadband data, real-time audio and voice applications, and software to

---

[3] The application for United States Patent No. 8,122,128, from which the '468 Patent is a continuation, was filed November 16, 2004.

subscribers . . . while also protecting the rights of the owners of content, that is, the owners of intellectual property.  '925 Patent at col. 1, ll. 30-34, 53-56.

56.     As explained above, the Patents-in-suit do not take a well-known or established business method or process and merely apply it using a general-purpose computer.  Indeed, the specific systems and processes described and claimed in the Patents-in-suit have no direct corollary to well-known business processes.  The Patents-in-suit solve technical problems that arose in the context of providing internet services.  "The . . . Internet, [and] any similar private or managed network, provides a convenient medium for the delivery of electronic data or content such as music, video, games, broadband data, real-time audio and voice applications, and software to subscribers," but that convenient medium for the delivery of electronic data produced some serious problems.  '925 Patent at col. 1, 11. 30-34.  "Recent music industry lawsuits over the distribution of pirated music . . . evidence[d] the difficulties" that could not be solved by digital rights management laws and policies alone.  *Id.* at ll. 56-59.  Before "content providers" would make digital copies of their materials available for electronic distribution they "need[ed] assurance that the intellectual property (music, video, games, software, etc.) [would] be secure from illegal downloading and transmission over the Internet," which the music industry had shown was "a major source of lost revenues and the basis for hundreds of lawsuits."  *Id.* at ll. 60-64.  The new techniques claimed in the '925 and '468 Patent "reduce the strain on . . . content provider's resources" and also reduce the "volume[] of network data traffic" which thereby "improve the speed and efficiency of

FIRST AMENDED COMPLAINT                                           Page 17

accessing content in a network." *Id*. at col. 2, ll. 8-11.  The Patents-in-suit provide technical solutions to technical problems intrinsically tied to computer networks including the internet.

57.    The claims of the Patents-in-suit involve more than performance of well-understood, routine, or conventional activities previously known to the industry.  Method Claim 23 of the '468 Patent and method claim 29 of the '925 Patent illustrate.

**COUNT I**
**GRANDE'S INFRINGEMENT OF THE '468 PATENT**

58.    MCM refers to and incorporates herein all the allegations of the previous paragraphs.

59.    Grande directly infringed and continues to infringe at least Claim 23 of the '468 Patent, which recites:

> A method for regulating access to a service provider network, the method comprising:
>
> generating, by a controller node coupled to the service provider network, controller instructions;
>
> transmitting the controller instructions, by the controller node, to a plurality of gateway units of the service provider network;
>
> receiving, by the gateway units, user-entered content requests for the service provider network;
>
> receiving, by the gateway units, from the controller node, the controller instructions;

> selectively transmitting, by the plurality of gateway
> units, the content requests to the service provider network
> in accordance with the controller instructions; and
>
> transferring, by the gateway units, received content
> data responsive to the transmitted content requests from
> the service provider network.

'468 Patent at col. 20, l. 59—col. 21, l. 9.  *See* Exhibit C attached hereto (claim chart to Grande on Claim 23 of the '468 Patent).

60.     As described above, and referenced below, the Grande network, including distribution equipment and installed STBs at customer's premises, is a network.  This network is a service provider network, and Grande uses this network to provide Internet, Phone, and Cable TV services to its customers.  Grande, through its control and use of the Grande network performs methods for regulating access to its service provider network.  In particular, Grande regulates access by its STBs, installed in its customers' premises, to IPPV content (e.g. movie content) that is stored in the Grande headend data center.  See Exhibit E (Grande Communications, Customer Guide (Effective December 1, 2013)) at pp. 1, 4-7, 13, 19, 54, 55; Exhibit F (Grande Digital Cable & DVD Quick Guide) at p. 5-6; Exhibit G (Get Answers to Your Technical Questions with these Grand Communications) at faq/technical; Exhibit H (Grande Communications, Job Posting (February 28, 2018)).

61.     MCM has been damaged by Grande's infringing conduct, and continues to be damaged by Grande's infringing conduct, and is therefore entitled to money damages adequate to compensate for Grande's infringement, but in no event less

than a reasonable royalty for the use made of the invention by Grande, together with interests and costs as fixed by the Court pursuant to 35 U.S.C § 284.

## COUNT II
## GRANDE'S INFRINGEMENT OF THE '925 PATENT

62.     Plaintiff refers to and incorporates herein all the allegations of the previous paragraphs.

63.     Grande directly infringed and continues to infringe at least Claim 29 of the '925 Patent, which recites:

> A method for regulating access to a service provider network, the method comprising:
>
> generating, by a controller node coupled to the service provider network, controller instructions;
>
> transmitting the controller instructions, by the controller node, to a plurality of network elements of the service provider network;
>
> receiving, by the network elements, content requests for the service provider network;
>
> selectively transmitting, by the plurality of network elements, the content requests to the service provider network in accordance with the controller instructions; and
>
> transferring, by the network elements, received content data responsive to the transmitted content requests from the service provider network.

'925 Patent at col. 21, ll. 36-51. *See* Exhibit D attached hereto (claim chart to Grande on Claim 29 of the '925 Patent).

64.     As described above, and referenced below, the Grande network, including distribution equipment and installed STBs at customer's premises, is a

network.  This network is a service provider network, and Grande uses this network to provide internet, phone, and cable TV services to its customers.  Grande, through its control and use of the Grande network, performs methods for regulating access to its service provider network.  In particular, Grande regulates access by its STBs, installed in its customers' premises, to IPPV content (e.g. movie content) that is stored in the Grande headend data center.  *See* Exhibit E (Grande Communications, Customer Guide (Effective December 1, 2013)) at pp. 1, 4-7, 13, 19, 54, 55; Exhibit F (Grande Digital Cable & DVD Quick Guide) at p. 5-6; Exhibit G (Get Answers to Your Technical Questions with these Grand Communications) at faq/technical; Exhibit H (Grande Communications, Job Posting (February 28, 2018)).

65.     MCM has been damaged by Grande's infringing conduct, and continues to be damaged by Grande's infringing conduct, and is therefore entitled to money damages adequate to compensate for Grande's infringement, but in no event less than a reasonable royalty for the use made of the invention by Grande, together with interests and costs as fixed by the Court pursuant to 35 U.S.C § 284.

## JURY DEMAND

66.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury for all issues so triable by right.

## PRAYER FOR RELIEF

Plaintiff Multimedia Content Management LLC respectfully requests this Court enter judgment in its favor against defendant Grande Communications Networks LLC, granting the following relief:

FIRST AMENDED COMPLAINT                                     Page 21

A.     An adjudication that Grande has infringed and continues to infringe claims of the '468 Patent and the '925 Patent;

B.     An award to MCM of damages adequate to compensate MCM for acts of infringement together with prejudgment interest pursuant to 35 U.S.C. § 284;

C.     A declaration that this case is exception under 35 USC § 285;

D.     An award of MCM's fees, costs, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by law; and

E.     Any further relief this Court deems just and proper.

Dated:  March 12, 2018               Respectfully submitted,

/S/ Craig S. Jepson
Raymond W. Mort, III
Texas State Bar No. 00791308
Craig Jepson
Texas State Bar No. 24061364

TOLER LAW GROUP, PC
8500 Bluffstone Cove, Suite A201
Austin, Texas 78759
Telephone: (512) 327-5515
Facsimile: (512) 327-5575
rmort@tlgiplaw.com
cjepson@tlgiplaw.com

**ATTORNEYS FOR PLAINTIFF
MULTIMEDIA CONTENT
MANAGEMENT LLC**

FIRST AMENDED COMPLAINT                                 Page 23